```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
```

**UNITED STATES OF AMERICA**          :

                                                :

        v.                          Cr. No. 07-234 (PLF)

                                                :

**NATHAN SMITH**          :

### MOTION FOR LEAVE TO LATE FILE BY ONE BUSINESS DAY

    Mr. Nathan Smith, through undersigned counsel, respectfully moves this Honorable Court to extend by one day the time for filing a supplement to his motions to suppress. The supplement was due Friday, December 7, 2007, but due to other commitments counsel was unable to complete it until Monday, December 10, 2007. Counsel has not yet been able to reach government counsel to obtain her position on this motion for leave to late file.

                                            Respectfully submitted,

                                            A.J. KRAMER
                                            FEDERAL PUBLIC DEFENDER

                                                     /s/
                                          _____
                                          Mary Manning Petras
                                          Assistant Federal Public Defender
                                          625 Indiana Avenue, N.W.
                                          Suite 550
                                          Washington, D.C.  20004
                                          (202) 208-7500

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
```

**UNITED STATES OF AMERICA**          :
                                      :
    **v.**         :          Cr. No. 07-234 (PLF)
                                      :
**NATHAN SMITH**                      :

<u>**ORDER**</u>

Upon consideration of defendant's Motion for Leave to Late File by One Business Day, it is this ___ day of December, 2007, hereby

ORDERED that the motion is GRANTED.

_____
THE HONORABLE PAUL L. FRIEDMAN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**         :
                                      :
    v.                               :         Cr. No. 07-234 (PLF)
                                      :
**NATHAN SMITH**                      :

### DEFENDANT'S SUPPLEMENT TO
### MOTION TO SUPPRESS TANGIBLE EVIDENCE

Mr. Nathan Smith, through undersigned counsel, respectfully submits the following in support of his motion to suppress the use as evidence at trial of all tangible objects seized from him and the two show-up identifications obtained on August 20, 2007.[1]

### Factual Background

The Court held a hearing on Mr. Smith's motions on November 20 and 26, 2007. At the hearing, the government offered the testimony of two police officers, Detective Anthony Johnson and Officer Michael Derian, and a recording of the police radio communications. The government's evidence showed that Mr. Smith was seized by the police because he was a tall, dark-skinned, black man within 300 yards of a bank where a robbery occurred more than 14 minutes earlier, and he ran when the police startled him.

---

[1] This pleading supplements only Mr. Smith's argument that the show-up identifications must be suppressed as the fruit of the unlawful seizure of Mr. Smith. Mr. Smith, however, is not withdrawing or waiving any of the arguments previously made on his behalf.

On August 20, 2007, at 1:20 p.m., the Metropolitan Police Department dispatcher broadcasted an alert that the PNC Bank at 1348 4th Street, N.E. had been robbed and dispatched officers to the bank.  RR at 0:08.[2]  The dispatcher instructed other officers to canvass the area and, at 1:23 p.m., broadcast a lookout for the bankrobber.  RR at 1:58-2:59.  The lookout was for:

> a black male, he's tall, dark skin, white hat, blue shirt.  No weapon was used.  He handed someone a note in reference to possibly robbing the bank.  Black male, tall, six foot, dark skin, white hat, nothing further.  I need units to respond over to New York Avenue, New York Avenue.  He was last seen walking or headed toward New York Avenue.

Id.  Several minutes later, an officer who had arrived at the bank broadcast further information.  RR at 6:05.  The officer stated:

> Okay, in addition to the lookout.  It's not exactly a white hat.  He says it's like a white scarf that a woman would wear around her head.  Obtained was an undetermined [inaudible] like a Muslim, he's sayin' like a Muslim cap.  He saying he's slim built, has a slim face.  And on his face he has like scraggly hair on his face, like a light scraggly beard, and he's dark complected and also he put the money in a brown paper bag.

---

[2]The recorded police communications (or radio run) will be cited herein as "RR" and particular portions of the recording will be identified according to the running time stamp when the recording is played, i.e., the number of minutes and seconds into the recording at which the cited portion is heard.

Id.³  A short time later, the lookout was updated again to add that the bank robber was in his mid-20s.  RR at 10:25.

Sergeant John Haines, Officer Michael Derian and Officer Justin Linville were among the officers dispatched to canvass the area.  Tr. 11/26/07 at 4.  After receiving the information from the dispatcher, these officers went first to the subway stop at Florida and New York Avenues.  Tr. 11/26/07 at 6.  There, the officers stopped and briefly spoke to one man.  Id.  The officers then traveled to the McDonald's and then the Wendy's restaurant at the same intersection.  Id. at 7.  After checking those locations, the officers turned onto New York Avenue, traveling outbound toward the part of New York avenue that is a bridge over train tracks.  Id.  The officers went to that area because in the past they have found people who have committed robberies in that area under the bridge.  Id.

The officers parked along New York Avenue and got out of their police car.  Id. at 24.  They then walked to a "well-worn path" that leads to the area underneath the bridge.  Id. at 8, 33.  Sergeant Haines led the way, as Officers Derian and Linville followed.  Id.  As they headed under the bridge, the Officers

---

³Detective Johnson testified that the first officer to arrive on the scene broadcast a lookout for "a black male, six feet tall, dark skin, wearing a white turban type hat, a blue jacket."  Tr. 11/20/07 at 6.  Officer Derian testified that the lookout was "tall, black male, dark skin, a blue shirt, and some sort of white turban on his head."  Tr. 11/26/07 at 5.

came to a grate that was blocking their path.  Id.

Officer Derian has seen this same grate set up in the same position many times (regularly) before August 20th.  Id. at 34.  The area under the bridge has been used for a "very long time" as an area where homeless people stay.  Id. at 12-13.  The area is a "trash, urine and feces laden garbage dump, with beer bottles, zips of drugs, [and] there's clothing strewn everywhere.  It's in bags[;] it's in suitcases[;] it's stuck underneath the bridge."  Id. at 12.  According to Officer Derian, homeless people who stay in the area under the bridge regularly set up the grate to block the area off.  Id. at 34.

On August 20th, when Sergeant Haines pushed the grate ("creating a disturbance") to clear the path to the area under the bridge, a man Officer Derian identified as Nathan Smith "jumped straight up in the air and ran straight down the hill."  Id. at 8, 28.  The officers saw the man run down the hill, go over a fence onto the railroad tracks, and run into a shed, approximately 100 yards from where they first saw the man.  Id. at 9-10, 37.  As the man ran, the three officers gave chase, and Sergeant Haines said, "police."  Id.

After a short period of time, Mr. Smith stuck his head out of the shed.  Id. at 11.  At that point, Officer Derian drew his gun and "held it in a high tuck," against his chest.  Id. at 42.  Officer Derian then went toward Mr. Smith and said, "Show me your

hands. Show me your hands." Id. at 11. Mr. Smith complied. Id. Officer Derian then ordered Mr. Smith to "[g]et down on the ground," and Mr. Smith again complied. Id. Officer Derian and one or two other officers then went inside the shed, handcuffed Mr. Smith and helped him up. Id. at 11, 12; Tr. 11/20/07 at 45.

According to Officer Derian, Mr. Smith was detained, but not placed under arrest. 11/20/07 at 12. When first asked by government counsel, Detective Johnson testified that Mr. Smith was placed under arrest inside the shed. 11/20/07 at 10. Government counsel then asked the question again, giving Detective Johnson a choice between arrest and stop, and Detective Johnson took the cue and changed his answer to say that Mr. Smith was "apprehended." Id. On cross-examination, Detective Johnson again agreed that Mr. Smith had been arrested in the shed. Id. at 45. He, however, again took his cue from government counsel when she asked him the same question in a leading manner on re-direct, and Detective Johnson again changed his answer to "apprehended." Id. at 77.

According to Officer Derian, Mr. Smith was detained due to "[t]ime; place; circumstance." Id. at 12. Officer Derian testified that they saw Mr. Smith in that area 12 to 18 minutes after receiving the call for the bank robbery. Id. at 12. However, the area where Mr. Smith was seen was no more than 300 yards from the PNC Bank. Tr. 11/20/07 at 42. Officer Derian

believed that the area under the bridge was "the most logical place to go after [the officers] had ruled everything else out." Tr. 11/26/07 at 12. With regard to circumstances, Officer Derian explained that when Mr. Smith was running, he was holding his hand on his hip. Id. at 13. The officers did not, however, see anything in his hand. Id. at 45-46.

Mr. Smith's clothing did not match the lookout description. Id. at 14, 43. The lookout was for a man wearing a white hat and blue shirt. Mr. Smith was wearing nothing on his head, a white T-shirt and dark colored pants or bluejeans. Id. at 40, 41. Mr. Smith's height and age also did not match the lookout. The lookout was for a man who was six feet tall; Mr. Smith is 5'9" tall. RR at 1:58; Tr. 11/26/07 at 29. The lookout was for a man in his mid-20s; Mr. Smith was 35 years old. RR at 10:25; Tr. 11/20/07. The only part of the lookout description that, according to the officers who saw him, matched Mr. Smith was "[t]all, dark-skinned, black male." Tr. 11/20/07 at 14, 43; Tr. 11/26/07 at 11.

After handcuffing Mr. Smith, the officers took him in a police car to the PNC Bank, where they conducted show-up identification procedures. Tr. 11/20/07 at 16; Tr. 11/26/07 at 48. There, two tellers identified Mr. Smith as the man who robbed the bank. Id. at 12-13.

## Argument

The government concedes that the police officers did not have probable cause to arrest Mr. Smith at the time Officer Derian, with his gun drawn (although not pointed at Mr. Smith), ordered Mr. Smith to the ground and placed him in handcuffs. Tr. 11/26/07 at 54. Nonetheless, the government argues that the seizure of Mr. Smith was a reasonable investigatory stop.

Investigatory stops are constitutional only if based on reasonable articulable suspicion to believe that the person stopped is involved in criminal activity. Terry v. Ohio, 392 U.S. 1 (1968). "The Court assesses whether there is reasonable suspicion by looking at 'the whole picture' from the perspective of 'those versed in the field of law enforcement.'" United States v. Askew, 313 F.Supp.2d 1, 4 (D.D.C. 2004). Here, a review of all of the circumstances known to the police at the time Mr. Smith was seized demonstrates that the police did not have a reasonable articulable suspicion to believe he was involved in criminal activity and, therefore, the stop was illegal.

Moreover, although Mr. Smith may not have been formally arrested, Officer Derian's actions in drawing his weapon, ordering Mr. Smith to the ground and handcuffing him, exceeded the scope of reasonable actions under the circumstances. As the Seventh Circuit has recognized: "'[s]tops too intrusive to be justified by suspicion under Terry, but short of custodial

arrest, are reasonable when the degree of suspicion is adequate in light of the degree and duration of restraint.'" United States v. Tilmon, 19 F.3d 1221, 1226 (7th Cir. 1994). Although the lookout specifically noted that the bank robber had no weapon, Officer Derian drew his weapon in stopping a man who did not match the clothing, height, or age description given in the lookout.

Other than being a black man with dark skin, Mr. Smith did not match the physical description of the bank robber given in the lookout. The clothing description did not match – the bank robber was wearing a white hat and a blue shirt; Mr. Smith was wearing nothing on his head, a white T-shirt and dark colored pants or bluejeans. Id. at 40, 41. The age description did not match – the lookout was for a man in his mid-20s; Mr. Smith was 35 years old. RR at 10:25; Tr. 11/20/07. The height description did not match – the lookout was for a man who was six feet tall; Mr. Smith is 5'9" tall. RR at 1:58; Tr. 11/26/07 at 29. Officer Derian included height as a basis for the stop, indicating that he thought Mr. Smith was tall. Even assuming that Mr. Smith was "tall" (although he was three inches shorter than the lookout description), the fact that he was a tall, dark skinned black male was not sufficient grounds to stop him.

This Court has noted that "minuscule differences" between the lookout and the individual stopped do not negate reasonable suspicion. See United States v. Askew, 313 F.Supp.2d 1 (D.D.C.

2004). Here, however, the differences are not minuscule or minor. The difference go to the core of the description given in the lookout. Mr. Smith did not have a white (or any other color) hat; he was not wearing a blue shirt; and there is no evidence that the officers saw a scraggly beard. By his own admission, Officer Derian noticed that the only matching features were that Mr. Smith was a tall, dark skin, black male.

In <u>Askew</u>, the lookout was for "a black male, approximately six-feet tall, wearing a blue sweatshirt and blue jeans," and before stopping the defendant the police officer learned that the robber had a moustache. <u>Id</u>. at 2. The defendant was a black male, had a moustache, was six-feet, three-inches tall and was wearing blue sweatpants, a navy jacket and a navy fleece jacket. <u>Id</u>. at 2. The Court found that the three inch height difference along with the difference between blue jeans and blue sweatpants was not sufficient to negate reasonable suspicion, where the defendant's facial hair and the color of his jacket matched the lookout. <u>Id</u>. at 4. Here, there was not only a three-inch height difference -- the clothing was completely different and there was no facial hair match, as in <u>Askew</u>.[4]

Mr. Smith's proximity to the bank also does not support a reasonable suspicion. The bank robber was seen fleeing the area,

---

[4] The defendant in <u>Askew</u> did not contest on appeal the Court's finding that the stop and frisk of the defendant was constitutional. <u>See</u> <u>United States v. Askew</u>, 482 F.3d 532 (D.C. Cir. 2007), <u>vacated</u>, <u>rehearing</u> <u>en</u> <u>banc</u> <u>granted</u>.

9

and Mr. Smith was within 300 yards of the bank more than 12 to 18 minutes after the robbery occurred and the lookout was given. Cf. Askew (defendant was five blocks away, ten minute after robbery, on street where robber last seen).

The only remaining factor is flight.  The Supreme Court has "consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime." Wong Sun v. United States, 371 U.S. 471, 484 n.4 (1963) (citing cases rejecting proposition that "the wicked flee when no man pursueth, but the righteous are as bold as a lion").  The Court has found that these doubts as to the relevance of flight are equally relevant to findings of probable cause for arrest, noting that the "questions are inescapably related." Id. Findings of reasonable suspicion are similarly inescapably related.  While the Supreme Court has recognized "unprovoked flight upon noticing the police" as a factor relevant to determining reasonable suspicion, the Court has done so only when other factors are present and the flight is in response to police presence. Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

Here, unlike in Wardlow, Mr. Smith's flight was not in response to the known presence of police.  Officer Derian testified that Mr. Smith popped up and ran, as soon as Sergeant Haines pushed the grate.  He explained that the grate was placed in a position to block the path and could not be moved without creating a disturbance.  There is no evidence that Mr. Smith knew

that it was a police officer – as opposed to any other intruder – who pushed the grate.  Mr. Smith's flight in response to an unidentified intruder "must be regarded as ambiguous conduct." See Wong Sun, 371 U.S. at 483 (citing Miller v. United States, 357 U.S. 301, 309 (1958) (holding "that when an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight from the door must be regarded as ambiguous conduct.")).

In Wong Sun, the Supreme Court found that because the police officer who went to the defendant's door did not identify himself as a police officer, the defendant's "refusal to admit the officers and his flight down the hallway thus signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion."  Wong Sun, 371 U.S. at 483.  Because Mr. Smith's flight was not in response to police presence, but an unidentified intruder, it cannot support a reasonable articulable suspicion.  Just as in Wong Sun:

> A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officer themselves have provoked.  That result would have the same essential vice as a proposition [the Court has] consistently rejected – that a search unlawful at its inception may be validated by what it turns up.

Although the Court in Wong Sun was addressing probable cause, the holding is equally applicable to reasonable articulable suspicion – a vague suspicion cannot be transformed into a reasonable

articulable suspicion by ambiguous conduct.

At best, the evidence here demonstrates that Mr. Smith was startled when Sergeant Haines pushed the grate and then popped up and ran. Officer Derian testified that he and the other officers were wearing police jackets and that Sergeant Haines shouted, "police," as they pursued Mr. Smith. The Court could infer from this evidence that at some point Mr. Smith realized it was police officers who were chasing him and, nonetheless, continued to run. But that inference does not turn the flight into a valid basis for a reasonable articulable suspicion. In Wong Sun, just as here, after the defendant fled, the officer properly identified himself, but the Court, nonetheless, found that the flight was ambiguous conduct because it did not begin in response to the known presence of police officers. Wong Sun, 371 U.S. at 482-83. See also Smith v. United States, 558 A.2d 312, 316-17 (D.C. 1989) (flight can be use to support finding of reasonable suspicion only when flight clearly in response to show of authority by police), overruled in part on other grounds by Green v. United States, 662 A.2d 1388, 1390 (1995).

Regardless of the Court's findings regarding when Mr. Smith knew it was the police who were pursuing him, his flight does not constitute reasonable suspicion to stop him. As the United States Court of Appeals for the District of Columbia Circuit has recognize, flight is not "a reliable indicator of guilt without other circumstances to make its import less ambiguous." Hinton

v. United States, 424 F.2d 876, 879 (D.C. Cir. 1969).  As the Hinton court explained:

> It has long been "a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses."  Nevertheless, flight from the police may provide "additional justification" for an arrest and, "when coupled with specific knowledge on the part of the officer relating the suspect to evidence of crime," it may properly be considered in assessing probable cause.

Id.  Similarly, in Wardlow, where the Court found that flight supported a reasonable suspicion, there were other factors present – the defendant was in an area known for heavy narcotics trafficking, holding an opaque bag.  See Wardlow, 528 U.S. at 122-24.  Here, there was no other additional justification for seizing Mr. Smith.

Finally, the officers testified that Mr. Smith was holding his hand on hip as he ran, but this factor does not support the stop because the officers saw nothing in his hand.  Holding his hip, therefore added nothing to support the suspicion that Mr. Smith was involved in criminal activity.

The circumstances of this case were insufficient separately or together to justify even an investigatory stop by an officer with his gun drawn.  See, e.g., In re T.L.L., 729 A.2d 334 (D.C. App. 1999) (although defendant fled from police, no reasonable suspicion where description of robber as black teenagers – one

13

with medium complexion and one with dark brown complexion – wearing dark clothing was too general); <u>United States v. Jacquez</u>, 421 F.3d 338 (5th Cir. 2005) (no reasonable suspicion where officer stopped red car in area where shooting involving a red car had been reported fifteen minutes prior to stop).

## **CONCLUSION**

For the reasons set forth above and the reasons set forth in Mr. Smith's motions, Mr. Smith respectfully requests that his motions be granted and that the Court suppress the use as evidence of all tangible evidence seized from him and the identifications made during the show-up procedures.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Mary Manning Petras
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C.  20004
(202) 208-7500

14