UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.   : | Criminal No. 07-234 (PLF) |
| : | |
| NATHAN SMITH : | |
| also known as Nathaniel Ames : | |
| also known as Mark Rhodes : | |
| also known as Nathaniel Brenson : | |
| also known as Nathaniel Pembroke : | |

GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S
SUPPLEMENTTO MOTION TO SUPPRESS TANGIBLE EVIDENCE[1]

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant's supplement to motion to suppress tangible evidence and identification testimony. As grounds for this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing on this motion.

I.   Introduction

On November 20, 2007 and November 26, 2007 the Court held a hearing on the defendant's motion to suppress identification testimony. The Court heard testimony from Detective Anthony Johnson and Officer Michael Derian. The government's evidence showed that (1) on August 20, 2007 the PNC Bank located at 1248 4th Street, NE reported to the Metropolitan Police Department that that the bank had been robbed, (2) the man who robbed the bank was described as tall, dark skinned, black male with a slim build and a slim face, wearing a

---

[1] This opposition only responds to the specific arguments raised in the Defendant's supplement to his motion to suppress the show-up identifications as the fruit of an unlawful seizure.

white turban and a blue shirt, (3) the bank robber was last seen leaving from the bank towards New York Avenue, (4) 10 to 15 minutes after the robbery the defendant was found hiding behind a grate underneath a New York Avenue overpass that was about 300 yards away from the PNC Bank, (5) the defendant immediately fled from the police when they pushed aside the grate and repeatedly identified themselves as police officers, (6) the defendant matched the height, build and complexion of the bank robber, and (7) while the defendant fled from the police he was observed holding something on his right side.  Based on all of this evidence, the police had more than enough articulable suspicion to stop the defendant so that they could conduct a show-up identification procedure, and then to arrest him based the positive identification made of the defendant by both the victim bank teller and an eyewitness bank teller.

## II.    Factual Background

On August 20, 2007, at approximately 1:20 p.m. the defendant walked into the PNC Bank located at 1348 4th Street, NE, approached the victim bank teller's window and passed him a note stating "Give me $10,000 or I'll start shooting" (11/20/07 Tr. at 5).  The victim bank teller handed the defendant $7,447 that the defendant placed into a brown paper bag. Id.  The defendant then left the bank, and was last seen by the teller's heading towards New York Avenue, NE in the direction of the train tracks (11/20/07 Tr. at 5-6).  The police dispatcher was notified about the bank robbery and a lookout was broadcast (11/20/07 Tr. at 6; 11/26/2007 Tr. at 4-5).  The lookout was for a black male, approximately 6 feet tall, with dark skin complexion, wearing a blue shirt or jacket, and something that looked like a white turban on his head (11/20/07 Tr. at 5;  11/26/07 Tr. at 6).  The lookout also indicated that the person who robbed the bank was last seen leaving the bank and heading towards New York Avenue, NE.

Officer Michael Derian, Sergeant John Haines, and Officer Justin Linville of the Metropolitan Police Department were on patrol in the area when they heard the report of the bank robbery and the lookout being broadcasted over the radio by the police dispatcher (11/26/07 Tr. at 4-5). All of the officers were in plain clothes but they were wearing tactical vests over their clothes that had the word "POLICE" written in large letter on both the front and the back of the vest (11/26/07 at 10). Officer Derian was familiar with the area because he had investigated cases, particularly robberies, in that area before (11/26/07 Tr. at 5). The officers responded to the dispatch and began to canvas the area near the PNC bank, first by going to the metro station that was located near Florida Avenue and New York Avenue, NE, then to a McDonald's and a Wendy's in the same area. (11/26/07 Tr. at 6-7).

The officers next went up New York Avenue to investigate an area underneath a bridge that is over train tracks because in the past they had found that robbery suspects would hide in that area (11/26/07 Tr. at 7). As the officers climbed down an embankment underneath the bridge, the officers came across a grate that was blocking their path (11/26/07 Tr. at 8). As Sergeant Haines pushed aside the grate, the defendant immediately got up from where he was hiding behind the grate fled from the police officers (11/26/07 Tr. at 8-9). Officer Derian repeatedly announced himself as a police officer after the defendant got up from where he was hiding behind the grate and fled from the police. (11/26/07 Tr. at 10). All three officers then chased the defendant down a hill for approximately 100 yards until he ran into a shed by the train tracks. Id. As the defendant was running from the police, Officer Derian and Sergeant Haines observed that the defendant had his hand on his right side holding on to something (11/26/07 Tr. at 14; 11/20/07 Tr. at 26-27). The officers set up a perimeter around the shed, and eventually the

defendant came out of the shed, was detained by Officer Derian, and was then taken back to the PNC bank for a show-up identification procedure (11/26/07 Tr. at 11, 14-15).

Officer Derian testified that the defendant matched the description of the bank robber given by the dispatcher in that the defendant was a tall, black male with dark complexion (11/26/07 Tr. at 14). Officer Derian further testified that when he decided to detain the defendant for the show up identification procedure he considered the fact that the defendant was found hiding approximately 300 yards from the PNC Bank, that the he fled when the police found him even though the officers were wearing clothing with police insignia and they repeatedly identified themselves as police officers, that the defendant seemed to be holding something on his right side as he fled, and that the bank robbery had occurred 12 to 15 minutes prior to the defendant being found by the police (11/26/07 Tr. at 11/14).

The defendant was then taken back to the PNC Bank where a show up identification procedure was conducted. The defendant was then identified by the victim bank teller and an eyewitness bank teller as the man who had robbed the bank that afternoon (11/26/07 Tr. at 12-13).

### III. Argument

    A. <u>The Police Had Ample Articulable, Reasonable Suspicion To Detain The Defendant To Conduct A Show-Up Identification Procedure And Probable Cause To Arrest The Defendant After He Was Identified By Two Witnesses</u>

Under <u>Terry v. Ohio</u>, 392 U. S.1 (1968), a police officer may "stop and briefly detain a person for investigative purposes," even without probable cause, when the officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" <u>United States v. Sokolow</u>, 490 U. S.1, 7 (1989) (quoting <u>Terry</u>, 392 U. S. at 30), or that the person "was involved in or is wanted in connection with a completed felony," <u>United States v. Hensley</u>, 469

U. S.221, 229 (1985).[2]  "Reasonable suspicion" is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U. S.119, 122 (2000).[3]  Although an officer must have more than an "inchoate and unparticularized suspicion or hunch," a valid Terry stop requires only "some minimal level of objective justification." Sokolow, 490 U. S. at 7 (internal quotation marks omitted). Accordingly, an officer may initiate a Terry stop "based not on certainty, but on the need to 'check out' a reasonable suspicion." United States v. Edmonds, 240 F.3d 55, 59 (D. C. Cir.2001) (internal quotation marks omitted); see also Cortez, 449 U. S. at 418 ("The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same-and so are law enforcement officers.").

In determining whether a Terry stop was supported by reasonable suspicion, a court examines "the totality of the circumstances -- the whole picture," Cortez, 449 U. S. at 417, and "does not separately scrutinize each factor relied upon by the officer conducting the search." Edmonds, 240 F.3d at 59.  "[E]ven though a single factor might not itself be sufficiently

---

[2] As the Court explained in Adams v. Williams, 407 U.S. 143, 145-46 (1972):
"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

[3] Probable cause is "a fair probability that contraband or evidence of a crime will be found." Illinois v. Gates, 462 U.S. 213, 238 (1983). Reasonable suspicion is "a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors -- especially when viewed through the eyes of an experienced officer -- may." Id. at 60. The totality-of-the-circumstances test "allows officers... to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U. S.266, 273-74 (2002) (quoting Cortez, 449 U. S. at 418).

In the instant situation, the officers received a lookout description of a suspect in a bank robbery, along with information that the suspect was last observed leaving the bank and heading towards New York Avenue. According to Officer Derian's testimony, within 12 to 15 minutes of the bank robbery the defendant was found hiding underneath a bridge that was within 300 yards of the PNC Bank. When the officers pushed aside the grate, the defendant immediately fled even though the officers immediately and repeatedly identified themselves as police officers, and they were wearing police tactical vests with the word "POLICE" written in large letters on the front and back of their vests. The officers further observed that while he was fleeing the defendant was holding something on his right side. Finally, the defendant matched the description of the bank robbery suspect in height, gender, and complexion.

United States v. Davis, 235 F.3d 584, 587 (D. C. Cir.2000), cert. denied, 534 U. S.860 (2001), is illustrative. There, officers received two descriptions of a shooting suspect: (1) lookouts describing the suspect as a black male, wearing all-black clothing, carrying a small weapon, and possibly riding a bike; and (2) a later 911 call describing the suspect as a male, wearing all black, on foot, running away from 2308 North Capitol Street. Id. at 586. Shortly after the 911 call, the officers saw Davis and a companion walking together a block from 2308 North Capitol Street. Davis, a black male, was wearing dark blue coveralls. Id. The D.C. Circuit upheld the officers' stop of Davis because "the police found [him] within a block of a shooting

that occurred just thirty minutes earlier and [he] matched the primary suspect in several critical respects," including "sex, race, clothing, and location." Id. at 588.  Acknowledging that Davis did not match the descriptions in other respects -- he was with a companion, he was not riding a bicycle, and he did not appear to be carrying a small weapon -- the Court deemed those differences "minor inconsistencies involving mutable characteristics." Id. The fact that Davis's clothing was dark blue rather than black also was immaterial because "Davis's dark blue coveralls likely appeared black in the dark." Id.  Setting aside these minor differences, the D.C. Circuit concluded that "Davis matched the lookouts and the 911 caller's description sufficiently to supply the reasonable suspicion required by Terry." Id.

Similarly, in United States v. Hutchinson, 408 F.3d 796, 801 (D. C. Cir.2005), the police received a lookout for a stabbing suspect described as a black male in his twenties, 5'6" to 5'9", wearing dark clothes, and having a "bush" hair style pulled back and tied. Id. at 798.  Roughly an hour after the stabbing, the police stopped Hutchinson two to three blocks from the scene of the crime.  Hutchinson was a black male, was 5'11" to 6'0", was wearing dark blue pants and a white shirt, was carrying a shoulder bag, and had a bush hair style pulled back into a tail -- an attribute the police considered "'very striking.'" Id. After Hutchinson had answered questions about his whereabouts, a detective retained his identification for two to five minutes to verify his identity through a "WALES" check. Id.  This Court held that the brief extension of the Terry stop was reasonable, in part, because of "the close match between Hutchinson's appearance and the lookout report, his proximity to the crime scene both temporally and geographically, and the Detective's concern that Hutchinson might have taken off a dark shirt." Id. at 801.

In United States v. Simpson, 992 F.2d 1224 (D. C. Cir.), cert. denied, 510 U. S.906 (1993), a rape victim described two assailants, one of whom was a black male of medium

complexion, 17 to 18 years old, stocky, 5'9", and wearing black pants and a black jacket with silver buttons; the victim said she had seen this assailant before in the vicinity of the crime. Id. at 1225. Later in the day, the police located Simpson within a block of the scene of the crime. Simpson was 25 years old, 5'7", and weighed approximately 190 pounds. He was wearing a plain burgundy shirt, black denim jeans, black Reebok tennis shoes, and a black leather jacket. Id. at 1225-26. The D.C. Circuit upheld the stop of Simpson, finding that the police reasonably suspected him of being involved in the rape:

> Simpson was wearing clothing similar to that described by the victim, was of the same general age group.. ., was of the same race and physical build.. ., and was in the vicinity of the crime. Generally, a confluence of such factors will be sufficient to justify a Terry stop. Id. at 1226.

Additionally, the D.C. Circuit has found that flight is a factor to be considered when weighing the totality of the circumstances in determining whether the police have articulable reasonable, suspicion to make an investigatory stop. See Wardlow, 120 S. Ct. at 676 ("our cases have . . . recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975) ("obvious attempts to evade officers can support a reasonable suspicion "); Sokolow, 490 U.S. at 8-9 (reasonable suspicions aroused by, inter alia, drug courier taking evasive path through airport); United States v. Prandy-Pinet, 995 F.2d 1069, 1069-1070 (D.C. Cir. 1993) (attempts by drug courier to evade undercover officers in train station, after making eye contact with them, contributes to determination of probable cause); United States v. Green 670 F.2d 1148, 1150-1151 (probable cause to arrest established when, *inter alia*, drug defendant appeared to walk away from officers after appearing to recognize unmarked police car).

These cases demonstrate that, contrary to the defendant's suggestion, a suspect need not match a lookout description in every detail to justify a Terry stop. Instead, the match need merely be close enough to provide "'some minimal level of objective justification'" for the stop. Davis, 235 F.3d at 586 (quoting INS v. Delgado, 466 U. S. 210, 217 (1984)); see also Cortez, 449 U. S. at 418 (Terry process deals with "probabilities" not "hard certainties"). In Davis and Simpson, that justification was supplied by the suspect's matching the lookout in "several critical respects," including sex, race, clothing, and location. Davis, 235 F.3d at 588. In Hutchinson, that justification was supplied by the suspect's geographic and temporal proximity to the crime, and the fact that he possessed a particularly distinctive feature (bush hair style tied back) described in the lookout, even though his height and clothing differed significantly from the lookout. 408 F.3d at 801. Moreover, the cases demonstrate that the defendant's flight is yet another factor that the supports the officers stopping the defendant to conduct an investigatory stop.

The defendant was 300 yards away from the PNC bank within 12 to 15 minutes after the bank robbery had occurred, matched the lookout[4], and immediately fled from the police upon being detected. The police had ample reasonable, articulable suspicion to stop the defendant and conduct a show-up identification procedure. See Davis, 235 F.3d 584, 587-88 (D.C. Cir. 2001); United States v. Purry, 545 F.2d 217, 220 (D.C. Cir. 1976) (lookout description broadcast in a bank robbery case "conclusively established probable cause" for arrest of defendant and subsequent identification procedures). During the show-up identification procedure, the defendant was identified by two bank tellers as the person who had robbed the bank earlier that

---

[4] The defendant's clothing when he was apprehended did not match the lookout. Officer Derian, however, testified that there was discarded clothing strewn about in the area underneath the bridge from where the defendant was found hiding (12/26/07 Tr. at 12).

day, giving the police probable cause to arrest the defendant. See generally United States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996); United States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1985).

### IV.  Conclusion

Based on the totality of the circumstances, the police had ample articulable, reasonable suspicion to stop the defendant to conduct a show-up identification procedure, and probable cause to arrest the defendant after he was positively identified by two witnesses.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

_____/s/_____
LOUIS RAMOS
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 472-176
DEBRA L. LONG-DOYLE
ASSISTANT UNITED STATES ATTORNEY
D.C. Bar No. 362-518
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W., Room 4243
Washington, DC 20530
(202) 305-2195   FAX:  (202) 305-2195
louis.ramos@usdoj.gov
debra.long-doyle@usdoj.gov